DocuSign Envelope ID: F4138762-6A9E-4203-9F29-25AF5E92983B

# Onemata Corporation

A Colorado Corporation

# FIRST AMENDED AND RESTATED STOCKHOLDERS AGREEMENT

Dated as of January 1, 2020

# TABLE OF CONTENTS

**ARTICLE 1  DEFINITIONS**..........................................................................................................1

**ARTICLE 2  RESTRICTIONS ON TRANSFERS OF COMPANY SECURITIES** ....................................... 2
   2.1     RESTRICTION ON TRANSFERS ..........................................................................................2
   2.2     RIGHTS OF FIRST REFUSAL ...............................................................................................2
   2.3     SECURITIES LAW RESTRICTIONS .......................................................................................3

**ARTICLE 3  STOCK REPURCHASE RIGHTS** ............................................................................. 4
   3.1.    FORFEITURE AND REPURCHASE RIGHT ......................................................................... 4
   3.2.1   APPRAISAL………………………………………………………….………………..6
   3.3     TRANSFERABILITY OF THE SHARES; ESCROW......................................................................6
   3.2     OWNERSHIP, VOTING RIGHTS, DUTIES ..............................................................................7

**ARTICLE 4  OTHER AGREEMENTS** ........................................................................................ 6
   4.1     NO ENCUMBRANCE .........................................................................................................6
   4.2     QUALIFIED SUBCHAPTER "S" SUBSIDIARY ELECTION ........................................................ 7

**ARTICLE 5  RESTRICTIVE LEGEND** ........................................................................................ 7

**ARTICLE 6  DRAG-ALONG RIGHTS**………………………………………………………8

**ARTICLE 7 GENERAL PROVISIONS**........................................................................................ 9
   7.1     SUCCESSORS AND ASSIGNS .............................................................................................. 9
   7.2     ENTIRE AGREEMENT; RELATION TO STOCK PURCHASER AGREEMENT; AMENDMENT. ........................ 10
   7.3     NOTICES ........................................................................................................................ 10
   7.4     DELAYS OR OMISSIONS ..................................................................................................10
   7.5     COUNTERPARTS .............................................................................................................10
   7.6     SEVERABILITY ...............................................................................................................10
   7.7     TITLE AND SUBTITLES ...................................................................................................11
   7.8     SPECIFIC PERFORMANCE................................................................................................11
   7.9     NEW PARTY ..................................................................................................................11
   7.10    GOVERNING LAW .......................................................................................................... 11
   7.11    ATTORNEYS' FEES………………………………………………………………… 11

# FIRST AMENDED AND RESTATED
# STOCKHOLDERS AGREEMENT

This First Amended and Restated Stockholders Agreement (this "Agreement"), is made effective as of January 1, 2020, by and among Onemata Corporation, a Colorado corporation (the "Company"); and the Securityholders of the Company who have executed a counterpart signature page to this Agreement. In addition, this Agreement shall be binding any Person that becomes a Securityholder at any time, whether as of the date of this Agreement or in the future.

## ARTICLE 1

### Definitions

As used in this Agreement, the following terms shall have the following respective meanings:

"Common Stock" means the Class A Voting Common Stock, no par value, and the Class B Non-Voting Common Stock, no par value, of the Company.

"Company" has the meaning ascribed to that term in the caption.

"Company Securities" mean any equity securities, or securities convertible into or exercisable or exchangeable for equity securities, of the Company, whether now owned or hereafter acquired.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, governmental agency or authority or any other entity of any kind.

"Purchase Price" means the consideration to be delivered to a Securityholder for a proposed Transfer.

"Relation" means, with respect to any Person, such Persons spouse and the parents, grandparents, brothers and sisters, children and grandchildren of such Person or of such Persons spouse.

"Securityholder" means any Person holding Company Securities.

"Smith" means William W. Smith, III, an individual residing in Colorado.

"Transfer" means any sale, assignment, pledge, hypothecation, encumbrance, disposition, transfer (including, without limitation, a transfer by will or intestate distribution), gift or attempt to create or grant a security interest in Company Securities, whether voluntary, involuntary, by operation of law or otherwise.

## ARTICLE 2

Restrictions on Transfers of Company Securities

2.1    Restriction on Transfers. Any Transfer of Company Securities by any Securityholder other than Smith that is not made in compliance with this Section 2 or Section 3 (as applicable) of this Agreement will be null and void, and the Company will not recognize any such purported Transfer or any purported new Securityholder resulting from the attempted Transfer. If Section 3 below is applicable, this Section 2.1 does not apply unless and until the Repurchase Option (defined below) terminates without exercise. Smith is not subject to the restrictions on Transfer in this Section 2.1.

2.2    Rights of First Refusal.

(a)    If any Securityholder desires to Transfer all or any portion of his, her or its Company Securities (the "Offered Securities") pursuant to a bona fide offer for cash or indebtedness such Securityholder (the "Selling Securityholder") shall first deliver to the Company and Smith written notice thereof (the "Notice of Sale"). The Notice of Sale shall set forth a description of the proposed Transfer, including the name of the proposed transferee, the number of Offered Securities involved, the Purchase Price, the date on or about which the proposed Transfer is to be made, the percentage of the Selling Securityholder's total holdings of Company Securities that the number of such Offered Securities proposed to be Transferred represent and all other terms and conditions of the proposed Transfer. Any offer in which the Purchase Price does not consist of cash or indebtedness shall not be considered a bona fide offer and shall not give any Securityholder the right to avail himself, herself or itself of the provisions of this Section 2.2.

(b)    For a period of 20 days following receipt of such Notice of Sale, the Company shall have the right to purchase all or any part of the Offered Securities designated in the Notice of Sale (i) for a purchase price equal to the product of the per share Purchase Price for all of the Offered Securities and the number of Offered Securities to be purchased by the Company, and (ii) on the terms and conditions set forth in the Notice of Sale. Notice of the Company's intention to purchase the Offered Securities shall be evidenced by a writing signed by the President of the Company and delivered to the Selling Securityholder and Smith prior to the end of the 20-day period following the Company's receipt of the Notice of Sale (the "Securityholder Notice"). Such acceptance shall specify the number of Offered Securities which the Company desires to purchase, and, if the Company does not elect to purchase all of the Offered Securities, the Securityholder Notice shall specify the number of Offered Securities not elected to be purchased by the Company (the "Remaining Securities"). If the Company elects to purchase all of the Offered Securities, the closing of the Company's purchase of such Offered Securities shall occur no later than 60 days following the Company's receipt of the Notice of Sale.

(c)    If the Company does not elect to purchase all of the Offered Securities, then for a period of 20 days following receipt of the Securityholder Notice, Smith shall have the right to purchase part or all of the Remaining Securities (i) for a purchase price equal to the

product of the per share Purchase Price for all of the Offered Securities and the number of Remaining Securities to be purchased by Smith, and (ii) on the terms and conditions set forth in the Notice of Sale. Notice of Smith's intention to purchase Remaining Securities shall be evidenced by a writing signed by Smith and delivered to the Company prior to the end of the 20-day period following receipt of the Securityholder Notice. Such acceptance shall specify the greatest number of Remaining Securities which such Smith desires to purchase (the "Desired Securities"). The closing of such purchase of Desired Securities shall occur no later than 60 days following Smith's receipt of the Securityholder Notice.

(d) If the Company and Smith do not elect to purchase, in the aggregate, all of the Offered Securities within the relevant time periods identified above, then the rights of first refusal, on the unpurchased Offered Securities, shall terminate, and the unpurchased Offered Securities may be Transferred by the Selling Securityholder to the transferee named in the Notice of Sale upon terms no more favorable to the transferee than those specified in the Notice of Sale, free of the rights of first refusal set forth in this Section 2.2; provided, however that the transferee shall become a party to this Agreement, shall execute and deliver a counterpart of this Agreement and shall agree to be subject to the restrictions and obligations hereunder; provided, further, that all of such restrictions and obligations shall remain in full force and effect with respect to the balance of the Selling Securityholder's Company Securities which were not offered for sale (if any); provided, further, that such Transfer must be completed within 60 days after the expiration of the relevant time periods identified above and on the terms and conditions described in the Notice of Sale, and if such Transfer is not consummated within such 60-day time period, then the Selling Securityholder must reoffer to the Company and Smith, in accordance with the provisions of this Section 2.2, the Company Securities that he, she or it desires to Transfer before the Selling Securityholder may thereafter Transfer all or any portion of his, her or its Company Securities.

2.3 <u>Securities Law Restrictions</u>. Notwithstanding any other provision in this Agreement, but subject to express written waiver by the Company in the exercise of its good faith and reasonable judgment, no Securityholder shall Transfer any Company Securities without the registration of the Transfer of such Company Securities under the Securities Act of 1933, as amended, or until the Company shall have received such legal opinions or other assurances that such Transfer is exempt from the registration requirements of the Securities Act of 1933, as amended, and applicable state securities laws as the Company in its good faith and reasonable discretion deems appropriate in light of the facts and circumstances relating to such proposed Transfer, together with such representations, warranties, indemnifications and other assurances from the transferor and the transferee as the Company in its good faith and reasonable discretion deems appropriate to confirm the accuracy of the facts and circumstances that are the basis for any such opinion and to protect the Company and the other Securityholders from any liability resulting from any such Transfer.

# ARTICLE 3

## Stock Repurchase Rights

3.1     Forfeiture and Repurchase right.

(a)     Termination of Employment for Reasons Other than Death or Disability.

(i)     If a Securityholder's employment with the Company is terminated (1) by the Company for Cause (as defined below), or (2) by the Securityholder without Good Reason (as defined below), the Company or any assignee of the Company's rights under this provision will have the right and option to purchase from that Securityholder all of the Company Securities owned by that Securityholder as of the date of termination of the Securityholder's employment at the price per share determined by the Board of Directors' most recent annual valuation of the Company, or if such annual valuation has not been determined in the two years prior to such termination of employment, at a price per share determined by appraisal in accordance with Section 3.2 (the "Repurchase Option").  If, however, the Securityholder (a) did not give the Board of Directors or his/her direct supervisor at least three months prior written notice of his/her termination, the price per share will be reduced by 25%; or (b) gave the Board of Directors or his/her direct supervisor over three months, but less than six months, prior written notice of his/her termination, the price per share will be reduced by 15%.

(ii)     Upon the occurrence of a termination of employment covered by Section 3.1(a)(i) above, the Company or its assignee of its rights may exercise the Repurchase Option by delivering personally, by courier, or by certified mail to the Securityholder, at any time following such termination of employment, a written notice of the Company's or the assignee's intention to exercise the Repurchase Option (the "Repurchase Option Exercise Notice").  The Repurchase Option Exercise Notice must state the date for the closing of the purchase, which date must be not later than 30 days after the delivery (as defined in Section 6.3 below) of the notice to the Securityholder.  The closing will occur at the principal office of the Company, unless the Company or its assignee and the Securityholder agree on a different location for the closing.  At the closing, the holder of the certificate evidencing the Company Securities shall deliver the certificate to the Company or its assignee (as applicable), and the Company or its assignee will deliver to the Securityholder the payment for the Company Securities being purchased.  Unless the Company or its assignee (as applicable) agree to pay the total purchase price for the Company Securities in cash at closing, the payment for the Company Securities being purchased will be in the form of a Promissory Note from the Company or its assignee, with the purchase price being the principal amount of the Promissory Note, and payment of the Promissory Note amortized over six years; and with interest at the lesser of (a) the "prime rate" as published in The Wall Street Journal on the 15th day of the month last preceding the date of the closing, or the next business day after that day if the 15th day of the month fell on a weekend or holiday, plus 1%; or (b) 8% per annum.

(iii)     If the Company decides to assign the Repurchase Option, it may assign it to one or more other persons, provided that (a) the transfer of the Company Securities to

the other person or persons would not violate Section 4.2 of this Agreement; and (b) as is the case with the Company, the person, or persons collectively, must exercise the entire Repurchase Option or decline to exercise the Repurchase Option.

(iv) This Agreement will continue to apply to the Securityholder whose employment has terminated until the Repurchase Option has been exercised and the closing under Section 3.1(a)(ii) has occurred.

(v) Certain Definitions. In this Agreement, the following terms have the following meanings:

A. "Cause" means: (i) the continued failure of a person who is an employee of the Company, after written notice is given to that person, to comply with the reasonable written directives of the Board of Directors of the Company or a superior officer or manager of the Company; (ii) the failure of a person to comply with the written terms of employment with the Company, and if a cure period exists in the written document for that breach, the non-compliance is not cured within the time period specified; (iii) any willful misconduct of the person resulting in material and demonstrable damage to the Company or its subsidiaries (if any); (iv) the use of alcohol or other substances by the person that substantially interferes with his or her ability to perform the essential functions of the position with the Company; or (v) engaging within the State of Colorado in any business that is In Competition (as defined below) with the business conducted by the Company, whether as proprietor, partner, joint venturer, employer, agent, employee, consultant, officer, or beneficial or record owner of more than 5% of the stock of a Company, business, or association. In this Agreement, a business is in "In Competition" with the Company if it is engaged in a business that is the same or similar to the business of the Company.

B. "Good Reason" will exist only at the happening of one or more of the following events without the consent of the person: (i) a relocation of more than fifty (50) miles of the person's office location; (ii) a material decrease in the person's base salary with the Company; (iii) a material and adverse change in the person's duties, control, authority, status, or position, or the assignment to the person of duties or responsibilities that are materially inconsistent with such status or position; (iv) a material breach by the Company of a written employment agreement, which breach is not cured within the time permitted in the written agreement; or (v) for the sole purpose of this Article 3, the dissolution and liquidation of the Company. Notwithstanding the prior sentence, Good Reason will exist only if the person: (1) first notifies the Board of Directors of the Company in writing of the event (or events) that the person believes constitutes a Good Reason event under subparts (i), (ii), (iii), and/or (iv) above within sixty (60) days from the date of that event; and (2) provides the Company with at least thirty (30) days to cure, correct, or mitigate the Good Reason event so that it either (A) does not constitute a Good Reason event, or (B) the person agrees, in writing, that after any such modification or accommodation made by the Company that the event does not constitute a Good Reason event.

(b) <u>Death or Disability of Securityholder</u>. Upon the death or Disability (as defined below) of a Securityholder who is an individual, the Company or its assignee will have

5

the same Repurchase Option as in Section 3.1(a) above, except that (1) the Repurchase Option Exercise Notice must be delivered to the Securityholder, or to the Securityholder's personal representative if the Secuirtyholder has died or has a personal representative because of incompetence, within 90 days after the Board of Directors of the Company is informed of the death or Disability of the Securityholder; and (2) the purchase price will not be reduced as could happen under Section 3.1(a)(i) above. For purposes of this Article 3, an individual will be deemed to have sustained a "Disability" if the individual has been unable to substantially perform his or her duties as an employee or director of the Company as a result of sickness or injury; and he or she remained unable to perform any such duties for a period of more than one hundred twenty (120) days in any twelve (12) month period.

    3.2    <u>Appraisal</u>. In the event an appraisal is required under Section 3.1(a)(1), it is agreed that, for the purpose of determining the purchase price to be paid, the price of each share of stock shall be determined by agreement or appraisal as provided in this Section 3.2. The parties to the purchase and sale shall attempt to agree upon a fair market value per share within fifteen (15) days of the date of the Repurchase Option Exercise Notice under Section 3.1. If the parties are unable to agree upon a purchase price per share within said period, the purchase price per share shall be determined by appraisal as follows: The transferring shareholder or the transferring shareholder's legal representative, as appropriate, shall designate one certified public accountant (CPA) and the acquiring party (the Company or Smith, as the case may be) shall designate one CPA. The CPAs shall jointly determine the fair market value per share. If the two CPAs cannot agree upon a value within thirty (30) days, they shall appoint a third CPA who, within fifteen (15) days, shall make a determination of fair market value per share, which determination shall be final. For purposes of this Agreement, the fair market value per share shall be the cash price at which a willing seller would sell and a willing buyer would buy, both having full knowledge of the relevant facts and being under no compulsion to buy or sell, in an arm's-length transaction without time constraints. Such appraisal shall take into consideration only the cash value of life insurance owned by the Company on the lives of the Shareholders, and shall not consider any death benefit payable to the Company as a consequence of the death of a shareholder whose shares are to be purchased pursuant to this Agreement. Such appraisals shall apply an appropriate lack of control and lack of marketability discounts in determining the fair market value per share. The valuation date for purposes of this Section 3.2, shall be the last day of the month preceding the month in which the event occurred which has given rise to the purchase and sale.

    3.3    <u>Transferability of the Shares; Escrow</u>.

    (a)    Each Securityholder hereby authorizes and directs the Secretary of the Company, or such other person designated by the Company, to transfer the shares as to which the Repurchase Option has been exercised from Securityholder to the Company.

    (b)    To insure the availability for delivery of Securityholder's shares upon repurchase by the Company pursuant to the Repurchase Option under Section 3.1, each Securityholder hereby appoints the Secretary, or any other person designated by the Company as escrow agent, as its attorney-in-fact to sell, assign and transfer unto the Company, such shares, if any, repurchased by the Company pursuant to the Repurchase Option and shall, upon execution

6

of this Agreement, deliver and deposit with the Secretary of the Company, or such other person designated by the Company, the share certificates representing the shares, together with the stock assignment duly endorsed in blank, attached hereto as <u>Exhibit A</u>. The shares and stock assignment shall be held by the Secretary in escrow, pursuant to the Joint Escrow Instructions of the Company and Securityholder attached as <u>Exhibit B</u> hereto, until the Company exercises its Repurchase Option or until such time as this Agreement no longer is in effect.

(c) The Company, or its designee, shall not be liable for any act it may do or omit to do with respect to holding the shares in escrow and while acting in good faith and in the exercise of its judgment.

3.4 <u>Ownership, Voting Rights, Duties</u>. This Agreement shall not affect in any way the ownership, voting rights or other rights or duties of the Securityholder, except as specifically provided herein.

## ARTICLE 4

### Other Agreements

4.1 <u>No Encumbrance</u>. Except as otherwise provided in this Agreement, no Securityholder shall pledge, hypothecate, encumber or otherwise permit a security interest to attach to Company Securities, whether now owned or hereafter acquired, or contract to pledge, hypothecate or encumber such Company Securities, without the prior written consent of the Company and Smith. Whether or not such consent is given, the rights of any securityholder shall be subordinate and subject to the rights and obligations created by this Agreement.

4.2 <u>Qualified Subchapter "S" Subsidiary Election</u>. The Securityholders acknowledge that the Company may elect to be taxed as a "small business corporation" under Subchapter S of the Internal Revenue Code, or the corresponding provisions of subsequent federal income tax statutes. The Securityholders acknowledge their intention to continue such election unless the Board of Directors votes otherwise. So long as the Company is taxable as an S corporation, the Securityholders shall not, without the unanimous consent of the other Securityholders or the Board of Directors, take any action, or make any transfer or other disposition of Company Securities that will result in the termination or revocation of such election from year to year. In accordance with the foregoing, it shall be a condition of any transfer of Company Securities by a Securityholder that the transferee agree in writing with the Company and any other Securityholder prior to such transfer, to be bound by the foregoing provisions of this Section 4.2 as though he or she were an original Securityholder. If any provision of this Agreement would result in the Company being ineligible to be treated as an S corporation for federal tax purposes, such provisions shall be null and void.

## ARTICLE 5

### Restrictive Legend

All certificates representing Company Securities, whether now owned or hereafter acquired, shall bear the following legend:

7

"The securities represented by this certificate have not been registered under either the Securities Act of 1933 (the "Act") or applicable state securities laws and may not be sold, transferred, assigned, offered, pledged or otherwise distributed for value unless there is an effective registration statement under such Act and such laws covering such securities, or the Corporation receives an opinion of counsel acceptable to the Corporation stating that such sale, transfer, assignment, offer, pledge or other distribution for value is exempt from the registration and prospectus delivery requirement of such Act and such law. Notwithstanding the foregoing, the securities represented by this certificate are subject to the terms and provisions of the First Amended and Restated Stockholders Agreement of the Corporation dated as of January 1, 2020 (the "Onemata Stockholders Agreement"). Any transfer or assignment of these securities are subject to forfeiture by the transferor, transferee and any holder of this certificate. A copy of the Onemata Stockholders Agreement is on file in the office of the Secretary of the Corporation. By acceptance of this certificate, the holder and any transferee of the holder hereof agrees to be bound by all of the terms, conditions and provisions of this legend and the Onemata Stockholders Agreement."

## ARTICLE 6

### Drag-Along Rights

6.1     <u>Definitions.</u> A "Sale of the Company" shall mean either: (a) a transaction or series of related transactions in which a person or entity, or a group of related persons or entities, acquires from the shareholders of the Company shares representing more than fifty percent (50%) of the outstanding voting power of the Company (a "Stock Sale"); or (b) any of the following transactions: (i) the sale or other disposition (other than by pledge or mortgage to a bona fide lender or in the ordinary course of business) of all or substantially all of the assets of the Company and its subsidiaries taken as a whole or (ii) the merger or consolidation of the Company with or into any other entity in which the Company is not the surviving or resulting entity and the Securityholders of the Company own less than fifty percent (50%) of the voting securities of the surviving or resulting corporation following such merger or consolidation.

6.2     <u>Actions to be Taken.</u> Notwithstanding anything to the contrary in this Agreement, in the event that the holders of a majority of the shares of Class A Voting Common Stock ("Selling Shareholders") approve a Sale of the Company in writing, specifying that this Article 6 shall apply to such transaction, then each shareholder hereby agrees:

(a)     if such transaction requires shareholder approval, with respect to all shares that such shareholder owns or over which such shareholder otherwise exercises voting power, to vote (in person, by proxy or by action by written consent, as applicable) all shares in favor of, and adopt, such Sale of the Company (together with any related amendment to the Articles of Incorporation required in order to implement such Sale of the Company) and to vote in opposition to any and all other proposals that could reasonably be expected to delay or impair the

ability of the Company to consummate such Sale of the Company;

(b) if such transaction is a Stock Sale, to sell the same proportion of shares of capital stock of the Company beneficially held by such shareholder as is being sold by the selling shareholders to the person or entity to whom the selling shareholders propose to sell their shares, and on the same terms and conditions as the selling shareholders;

(c) to execute and deliver all related documentation and take such other action in support of the Sale of the Company as shall reasonably be requested by the Company or the selling shareholders in order to carry out the terms and provisions of this Article 6, including without limitation, executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, consent, waiver, governmental filing, share certificates duly indorsed for transfer (free and clear of impermissible liens, claims and encumbrances) and any similar or related documents;

(d) to refrain from exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Sale of the Company; and

(e) if the consideration to be paid in exchange for the shares pursuant to this Article 6 includes any securities and due receipt thereof by any shareholder would require under applicable law (x) the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities or (y) the provision to any shareholder of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D of the Securities Act of 1933, as amended, the Company may cause to be paid to any such shareholder in lieu thereof, against surrender of the shares which would have otherwise been sold by such shareholder, an amount in cash equal to the fair value (as determined in good faith by the Company) of the securities which such shareholder would otherwise receive as of the date of the issuance of such securities in exchange for the shares.

## ARTICLE 7

### General Provisions

7.1 <u>Successors and Assigns</u>. The parties to this Agreement agree that the provisions of this Agreement shall be effective, valid and binding upon them and inure to their benefit and their respective heirs, executors, administrators, successors and assigns, and acknowledge explicitly that the effectiveness of this Agreement is not conditioned upon the execution of the Agreement by each and every Securityholder of the Company.

7.2 <u>Entire Agreement; Relation to Stock Purchase Agreement; Amendment</u>. This Agreement constitutes the full and entire understanding and agreement between the parties with regard to the subject matter hereof, and no party shall be liable or bound to any other party in any manner by any warranties, representations or covenants except as specifically set forth herein. The parties agree that in the event of any conflict between this Agreement and any stock purchase agreement by and between the Company or Smith and any Securityholder, the terms of

this Agreement shall control. Except as otherwise provided herein, this Agreement or any term hereof may be amended, waived, discharged or terminated by the consent of the Company, Smith, the holder of a majority of the Class A Voting Common Stock and the holders of a majority of the Class B Non-Voting Common Stock, provided, however, that no such amendment, waiver, discharge or termination shall not materially and adversely affect the rights of any Securityholder unless all Securityholders are treated equally.

7.3  Notices.

(a)  Any and all notices, consents, offers, elections and other communications required or permitted under this Agreement shall be deemed adequately given only if in writing and the same shall be delivered either personally or by mail or Federal Express or similar expedited commercial carrier, addressed to the recipient of the notice, postage prepaid and registered or certified with return receipt requested (if by mail), or with all freight charges prepaid (if by Federal Express or similar carrier), addressed (i) to any Securityholder, at such address as set forth on the signature page to the Joint Escrow Instructions attached hereto as Exhibit B, or at such address as such Securityholder shall have furnished the Company in writing, or (ii) if to the Company, at the address set forth on the signature page hereto, addressed to the attention of the President, or at such other address as the Company shall have furnished to the Securityholders in writing.

(b)  Each such notice, consent, offer, election or other communication shall for all purposes of this Agreement be treated as effective or having been given (i) when delivered if delivered personally, or (ii) upon deposit in the mail or with Federal Express or similar expedited commercial carrier in accordance with subsection (a), as the case may be, irrespective of the actual receipt thereof.

7.4  Delays or Omissions. Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party hereto, upon any breach or default of any party hereunder, shall impair any such right, power or remedy of such party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party shall be cumulative and not alternative.

7.5  Counterparts. This Agreement may be executed in counterparts, each of which shall be enforceable against the party actually executing such counterparts, and all of which together shall constitute one instrument.

7.6  Severability. Each section, subsection and lesser section of this Agreement constitutes a separate and distinct undertaking, covenant and/or provision hereof. In the event that any provision of this Agreement shall finally be determined to be unlawful, all such

provisions shall be deemed severed from this Agreement, but every other provision of this Agreement shall remain in full force and effect, and in substitution for any such provision held unlawful, there shall be substituted a provision of similar import reflecting the original intent of the parties hereto to the extent permissible under law; provided, however, that no such severability shall be effective if it materially changes the economic benefit of this Agreement to any party.

7.7     Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not considered in construing or interpreting this Agreement.

7.8     Specific Performance. The parties hereto agree that upon a breach of any provision of this Agreement a remedy at law would not be adequate, and that the parties hereto are entitled to injunctive relief and specific performance and any other legal or equitable remedies as remedies for the enforcement of this Agreement.

7.9     New Party. The execution and delivery of a counterpart to this Agreement pursuant to the terms hereof by a transferee of Company Securities or by a new Securityholder shall not be deemed an amendment hereof and shall not require, except as otherwise provided herein, the consent of any parties hereto.

7.10    Governing Law. This Agreement shall be governed in all respects by the laws of the State of Colorado.

7.11    Attorneys' Fees.  In the event of any dispute, arbitration or litigation between or among the parties to this Agreement, the substantially prevailing party(ies) shall be entitled to reimbursement of their attorneys' fees and costs from the non-prevailing party(ies).

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF,** this First Amended and Restated Stockholders Agreement is hereby executed effective as of the date first above written.

THE COMPANY:                                Onemata Corporation

By: *William W. Smith, III*
William W. Smith, III
President

THE SECURITYHOLDERS:

*William W. Smith, III*
William W. Smith, III

*Clay Anselmo*
Clay Anselmo

*Jerry Pokorny*
Jerry Pokorny

*Richard Owens*
Rick Owens

*Ryan McCabe*
Ryan McCabe

*Crystal Anzulewicz*
Crystal Anzulewicz

*Sara White*
Sara White

*Mike Higgins*
Mike Higgins

*Bradley D. Brown*
Brad Brown

12

# EXHIBIT A

## ASSIGNMENT SEPARATE FROM CERTIFICATE

      FOR VALUE RECEIVED I, _____, hereby sell, assign and transfer unto Onemata Corporation _____ (_____) shares of the _____ Common Stock of Onemata Corporation standing in my name of the books of said corporation represented by Certificate No._____ herewith and do hereby irrevocably constitute and appoint _____ to transfer the said stock on the books of the within named corporation with full power of substitution in the premises.

      This Stock Assignment may be used only in accordance with the First Amended and Restated Stockholders Agreement between Onemata Corporation and the undersigned dated January 1, 2020, as the same may be amended.

Dated: _____, _____      Signature:_____

INSTRUCTIONS: Please do not fill in any blanks other than the signature line. The purpose of this assignment is to enable the Company to exercise its "repurchase option," as set forth in the Agreement, without requiring additional signatures on the part of the Purchaser.

## EXHIBIT B

## JOINT ESCROW INSTRUCTIONS

Corporate Secretary
Onemata Corporation
518 17th Street, Suite 1350
Denver, CO 80202

Dear Secretary:

      As Escrow Agent for both Onemata Corporation (the "Company"), and the undersigned purchaser of stock of the Company ("Purchaser"), you are hereby authorized and directed to hold the documents delivered to you pursuant to the terms of that certain First Amended and Restated Stockholders Agreement (the "Agreement") between the Company and the undersigned, in accordance with the following instructions:

1. In the event the Company and/or any assignee of the Company (referred to collectively for convenience herein as the "Company") exercises the Company's repurchase option set forth in the Agreement, the Company shall give to Purchaser and you a written notice specifying the number of shares of stock to be purchased, the purchase price, and the time for a closing hereunder at the principal office of the Company. Purchaser and the Company hereby irrevocably authorize and direct you to close the transaction contemplated by such notice in accordance with the terms of said notice.

2. At the closing, you are directed (a) to date the stock assignments necessary for the transfer in question, (b) to fill in the number of shares being transferred, and (c) to deliver the stock assignments, together with the certificate evidencing the shares of stock to be transferred, to the Company or its assignee, against the simultaneous delivery to you of the purchase price in the form provided in the Agreement, for the number of shares of stock being purchased pursuant to the exercise of the Company's repurchase option.

3. Purchaser irrevocably authorizes the Company to deposit with you any certificates evidencing shares of stock to be held by you hereunder and any additions and substitutions to said shares as defined in the Agreement. Purchaser does hereby irrevocably constitute and appoint you as Purchaser's attorney-in-fact and agent for the term of this escrow to execute with respect to such securities all documents necessary or appropriate to make such securities negotiable and to complete any transaction herein contemplated, including but not limited to the filing with any applicable state blue sky authority of any required applications for consent to, or notice of transfer of, the securities. Subject to the provisions of this paragraph 3, Purchaser shall exercise all rights and privileges of a shareholder of the Company while the shares are held by you.

4. If at the time of termination of this escrow you should have in your possession any

documents, securities, or other property belonging to Purchaser, you shall deliver all of the same to Purchaser and shall be discharged of all further obligations hereunder.

5. Your duties hereunder may be altered, amended, modified or revoked only by a writing signed by all of the parties hereto.

6. You shall be obligated only for the performance of such duties as are specifically set forth herein and may rely and shall be protected in relying or refraining from acting on any instrument reasonably believed by you to be genuine and to have been signed or presented by the proper party or parties. You shall not be personally liable for any act you may do or omit to do hereunder as Escrow Agent or as attorney-in-fact for Purchaser while acting in good faith, and any act done or omitted by you pursuant to the advice of your own attorneys shall be conclusive evidence of such good faith.

7. You are hereby expressly authorized to disregard any and all warnings given by any of the parties hereto or by any other person or corporation, excepting only orders or process of courts of law and are hereby expressly authorized to comply with and obey orders, judgments or decrees of any court. In case you obey or comply with any such order, judgment or decree, you shall not be liable to any of the parties hereto or to any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being subsequently reversed, modified, annulled, set aside, vacated or found to have been entered without jurisdiction.

8. You shall not be liable in any respect on account of the identity, authorities or rights of the parties executing or delivering or purporting to execute or deliver the Agreement or any documents or papers deposited or called for hereunder.

9. You shall not be liable for the outlawing of any rights under the Statute of Limitations with· respect to these Joint Escrow Instructions or any documents deposited with you.

10. You shall be entitled to employ such legal counsel and other experts as you may deem necessary properly to advise you in connection with your obligations hereunder, may rely upon the advice of such counsel, and may pay such counsel reasonable compensation therefor.

11. Your responsibilities as Escrow Agent hereunder shall terminate if you shall cease to be an officer or agent of the Company or if you shall resign by written notice to each party. In the event of any such termination, the Company shall appoint a successor Escrow Agent.

12. If you reasonably require other or further instruments in connection with these Joint Escrow Instructions or obligations in respect hereto, the necessary parties hereto shall join in furnishing such instruments.

13. It is understood and agreed that should any dispute arise with respect to the delivery and/or ownership or right of possession of the securities held by you hereunder, you are authorized and directed to retain in your possession without liability to anyone all or any part of said securities until such disputes shall have been settled either by mutual written agreement of the parties concerned or by a final order, decree or judgment of a court of competent jurisdiction after the time for appeal has expired and no appeal has been perfected, but you shall be under no duty whatsoever to institute or defend any such proceedings.

14. Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery or upon deposit in the United States Post Office, by registered or certified mail with postage and fees prepaid, addressed to each of the other parties thereunto entitled at the following addresses or at such other addresses as a party may designate by ten (10) days' advance written notice to each of the other parties hereto.

15. By signing these Joint Escrow Instructions, you become a party hereto only for the purpose of said Joint Escrow Instructions; you do not become a party to the Agreement.

16. This instrument shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns.

17. These Joint Escrow Instructions shall be governed by the internal substantive laws, but not the choice of law rules, of Colorado.

**SHAREHOLDER**                                         **ONEMATA CORPORATION**

_____                          _____
Signature                                               William W. Smith III
                                                        President


ESCROW AGENT


_____
William W. Smith, III, Secretary
Dated Effective January 1, 2020